# UNITED STATES DISTRICT COURT

## for the

### Southern District of Florida

_____ Division

FILED BY ~~SAS~~ D.C.

APR 0 9 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

| | | |
|---|---|---|
| Akbar Marvasti | ) | Case No. _____ |
| | ) | |
| | ) | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | ) | |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | Jury Trial: *(check one)* ☐ Yes ☑ No |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | |
| *please write "see attached" in the space and attach an additional* | ) | |
| *page with the full list of names.)* | ) | |
| –v– | ) | |
| Mr. Willard L. Ross | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued. If the* | ) | |
| *names of all the defendants cannot fit in the space above, please* | ) | |
| *write "see attached" in the space and attach an additional page* | | |
| *with the full list of names.)* | | |

## COMPLAINT FOR A CIVIL CASE

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Akbar Marvasti |
| Street Address | 1865 Brickell Ave., Apt. A-902 |
| City and County | Miami |
| State and Zip Code | FL 33129 |
| Telephone Number | 601-466-0008 |
| E-mail Address | marvastia@gmail.com |

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Mr. Willard L. Ross |
| Job or Title *(if known)* | Secretary of Commerce |
| Street Address | 1401 Constitution Ave. NW |
| City and County | Washington |
| State and Zip Code | D.C. 20230 |
| Telephone Number | 202-482-9043 |
| E-mail Address *(if known)* | WLRoss@doc.gov |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

    b.    If the defendant is a corporation

The defendant, *(name)* _____, is incorporated under

the laws of the State of *(name)* _____, and has its

principal place of business in the State of *(name)* _____.

Or is incorporated under the laws of *(foreign nation)* _____,

and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

I was employed in 2010 as an Economist, ZP-0110-III, interval 3, at the NOAA, Southeast Fisheries Science Center, in Miami, Florida. NOAA recognized that this salary band was significantly below a salary consistent with my job experiences and achievements and promised a promotion in 2011. My offer letter states that I may be promoted without further competition to the target ZP-0110-IV. A promotion in 2011 would have removed my salary cap and resulted in annual increases in salary, and subsequently a significantly higher retirement allocation over time. I was finally promoted in later 2018. Denial of a promotion was a part of a persistent pattern of discrimination. Several supporting documents are attached.

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

I am seeking $303,456 for relief for past salary losses and reductions in retirement payments, which are based on past salaries (Exhibit 1). The loss in retirement account includes 5% of the salary as the government contribution to my retirement account, and percentage of the last 3 years of salary. Expected salary increases are consistent with actual salary increases of Christopher Liese, an economist in my group who was promoted in 2011. My damage estimate is conservative, because it does not include interest on past losses and income growth in the retirement account in the future. It also does not include any compensation for pain and suffering.

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question              ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. §2000e seq.

### B.     If the Basis for Jurisdiction Is Diversity of Citizenship

1.     The Plaintiff(s)

a.     If the plaintiff is an individual

The plaintiff, *(name)* _____ , is a citizen of the

State of *(name)* _____ .

b.     If the plaintiff is a corporation

The plaintiff, *(name)* _____ , is incorporated

under the laws of the State of *(name)* _____ ,

and has its principal place of business in the State of *(name)*

_____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.     The Defendant(s)

a.     If the defendant is an individual

The defendant, *(name)* _____ , is a citizen of

the State of *(name)* _____ . Or is a citizen of

*(foreign nation)* _____

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____April 9, 2020_____

Signature of Plaintiff _____

Printed Name of Plaintiff _____Akbar Marvasti_____

### B. For Attorneys

Date of signing: _____

Signature of Attorney _____

Printed Name of Attorney _____

Bar Number _____

Name of Law Firm _____

Street Address _____

State and Zip Code _____

Telephone Number _____

E-mail Address _____

Print | Save As... | Add Attachment | Reset

Exhibit 1

| time | With 2019 Promotion Salary | With 2011 Promotion Salary | Salary Gap | 5% Government Retirement Contribution |
|---|---|---|---|---|
| 2010 | 94500 | 94500 | 0 | 0 |
| 2011 | 94645 | 100500 | 5855 | 292.75 |
| 2012 | 94645 | 105525 | 10880 | 544 |
| 2013 | 95591 | 110801.3 | 15210.25 | 760.5125 |
| 2014 | 96555 | 116341.3 | 19786.31 | 989.3156 |
| 2015 | 97725 | 122158.4 | 24433.38 | 1221.669 |
| 2016 | 99586 | 128266.3 | 28680.3 | 1434.015 |
| 2017 | 101399 | 134679.6 | 33280.61 | 1664.031 |
| 2018 | 109432 | 141413.6 | 31981.59 | 1599.08 |
| 2019 | 117701 | 148484.3 | 30783.27 | 1539.164 |
| 2020 | 123586.05 | 148484.3 | 24898.22 | 1244.911 |
| 2021 | 129765.3525 | 148484.3 | 18718.92 | 935.946 |
| 2022 | 136253.6201 | 148484.3 | 12230.65 | 611.5326 |
| | Sum of Losses | | 256738.5 | 12836.93 |

Assuming Retirement in 2023 and life expectancy at age of 68 for white male at 85

13% of last 3 years of salary

| | | | |
|---|---|---|---|
| 2023 | 16882.88431 | 19302.96 | 2420.071 |
| 2024 | 16882.88431 | 19302.96 | 2420.071 |
| 2025 | 16882.88431 | 19302.96 | 2420.071 |
| 2026 | 16882.88431 | 19302.96 | 2420.071 |
| 2027 | 16882.88431 | 19302.96 | 2420.071 |
| 2028 | 16882.88431 | 19302.96 | 2420.071 |
| 2029 | 16882.88431 | 19302.96 | 2420.071 |
| 2030 | 16882.88431 | 19302.96 | 2420.071 |
| 2031 | 16882.88431 | 19302.96 | 2420.071 |
| 2032 | 16882.88431 | 19302.96 | 2420.071 |
| 2033 | 16882.88431 | 19302.96 | 2420.071 |
| 2034 | 16882.88431 | 19302.96 | 2420.071 |
| 2035 | 16882.88431 | 19302.96 | 2420.071 |
| 2036 | 16882.88431 | 19302.96 | 2420.071 |
| | Sum of Losses | | 33880.99 |

Total loss of salary during service:       256738.5
Total loss of retirement contribution:    12836.93
Total loss of % of last 3 years of salary: 33880.99
Grand Total of Losses                      303456.4

Exhibit 2

# AKBAR MARVASTI
## Curriculum Vita

**ADDRESS**

1865 Brickell Ave. Apt. A-902
Miami, FL 33129
Tel.     305-361-4243 (Work)
Tel.     601-466-0008 (Cell)
Email: marvastia@gmail.com

**CITIZENSHIP**

United States

**EDUCATION**

Louisiana State University, Baton Rouge, Louisiana
1979 to 1985
Degree: Ph.D. in Economics

Louisiana State University, Baton Rouge, Louisiana
1977 to 1979
Degree: M.B.A. (Concentrations in Economics and International Management)

Rasht University (Business College), Iran
1970 to 1974
Degree: B.S. in Business Administration

**TRAINING**

Teaching Fellowship in Oral and Written Communication, Quality Enhancement Program, University of Southern Mississippi, Fall, 2007.

Participated in Teachers Training Program (conducted by The Joint Council on Economic Education) in April, 1983.

**GRANTS/AWARDS**

"The Market for Quota Share Allocations and Allocation Transfers under the Red Snapper and Grouper-Tilefish IFQ Programs in the Gulf of Mexico and its Implications for Fishing Effort and Entry-Exit Decisions," (with Sami Dakhlia), National Marine Fisheries Service, NOAA (2016).

"Red Snapper and Grouper-Tilefish IFQ Programs and Occupational Injuries and Fatalities in the Gulf of Mexico," (with Sami Dakhlia), National Marine Fisheries Service, NOAA (2013).

"Behavior of Red Snapper Dockside Prices under an IFQ System," (with Eric Hillebrand and Tony Lamberte), National Marine Fisheries Service, NOAA (2011).

Business Advisory Committee Professorship Award, University of Southern Mississippi (2006).

Various Houston foundations (2002) on behalf of the Medical Equipment Network for the Disabled (Project MEND) on "Needs Assessment: Status of the Disadvantaged Population in the Houston Area."

1

United Nations Development Program (1992) to study "An Empirical Test of Purchasing Power Parity for Iran."

Canadian Studies Program Grant - Canadian Embassy (1987 through 1989) to study "Intra-Industry Trade Barriers between the U.S. and Canadian Cultural Industries" with E. R. Canterbery.

East Carolina University Summer Research Grant (1987) to study "Resource Characteristics, Extraction Costs, and Optimal Exploitation of Mineral Resources."

## PUBLICATIONS

### Refereed Journals:

Marvasti, Akbar (Forthcoming), "Value of Life and Injury: Evidence from a U.S. Fishery," *Contemporary Economic Policy*.

Marvasti, Akbar (Forthcoming), "Characteristics of the U.S. Seafood Trade Deficit: U.S. Shrimp Trade," *Marine Fisheries Review*.

Dakhlia, Sami, and Marvasti, Akbar (Forthcoming), "Regulatory Change, Industry Structure, and Fatalities: the Case of a Gulf of Mexico Fishery," *The Review of Industrial Organization*.

Marvasti, Akbar (2019), "Effect of the Safety Regulations on the Severity of Injuries in the Gulf of Mexico Commercial Fisheries," *Applied Economics* 51(38): 4164-4175.

Marvasti, Akbar (2017), "Determinants of the Risk of Accidents in the Gulf of Mexico Commercial Fisheries," *Ocean and Coastal Management,* 148(11): 282-287.

Marvasti, Akbar, and Dakhlia, Sami (2017), "Occupational Safety and the Shift from Common to Individual Fishing Quotas in the Gulf of Mexico," *Southern Economic Journal*, 83(3): 705-720.

Marvasti, Akbar, and Carter, David (2016), "Domestic and Imports Sources of Supply to the U.S. Shrimp Market and Antidumping Duties," *Journal of Economic Studies*, 43(6): 1039-1056.

Marvasti, Akbar, and Lamberte, Tony (2016) "Commodity Price Volatility under Regulatory Changes and Disaster," *Journal of Empirical Finance*, 38(September): 335-361.

Carter, David, Marvasti, Akbar, Liese, Christopher, and Crosson, Scott (2016) "Valuing Sportfishing Harvest with the Demand for Boat Fuel," *Marine Resource Economics*, 31(3): 323-338.

Marvasti, Akbar (2014) "Estimates of Demand and Supply for Physician Services: A Panel Data Analysis," *Economic Modelling*, 43: 279-286.

Marvasti, Akbar (2013) "An Econometric Analysis of Ocean Mineral Exploration Activities," *Resource Policy*, 38(1): 68-74.

Marvasti, Akbar (2013) "Estimating Outdoor Recreation Demand: A Revealed Preference Approach," *Ocean and Coastal Management*, 71(1): 170-175.

Marvasti, Akbar (2012) "An Analysis of Barter in Broadcasting Industry," *Journal of Economic Studies*, 39(5): 537-553.

Marvasti, Akbar (2011) "Barter and Business Cycles: Further Evidence," (with David Smyth), *The American Economist,* 56(2): 85-97.

Marvasti, Akbar (2010) "Occupational Safety and English Proficiency," *Journal of Labor Research*, 31(4): 332-347.

Marvasti, Akbar (2010) "A Welfare Estimation of Beach Recreation with Aggregate Data," *Applied Economics*, 42(1-3): 291-296.

Marvasti, Akbar (2007) "Foreign-Born Teaching Assistants and Student Achievement: An Ordered Probit Analysis," *The American Economist*, 51(2): 61-71.

Marvasti, Akbar and Smyth David (2006) "Barter's Role in Money-Income Relationship," *Pacific Economic Review*, 11(3): 395-408.

Marvasti, Akbar (2006) "A Contingent Valuation of Customer Delay in Medical Services," *Eastern Economic Journal*, 32(1): 31-45.

Marvasti, Akbar (2005) "U.S. Academic Institutions and Foreign-Born Instructors' Language Proficiency," *Journal of Economic Issues*, 39(1): 151-76.

Marvasti, Akbar and Canterbery, Ray (2005) "Culture and Other Barriers in Motion Pictures Trade," *Economic Inquiry*, 45(1): 39-54.

Canterbery, Ray and Marvasti, Akbar (2001) "The U.S. Motion Pictures Industry: An Empirical Approach," *The Review of Industrial Organization*, 19(1): 81-98.

Marvasti, Akbar and Smyth, David (2001) "The Impact of Trend and Cyclical Behavior of Inflation and Inventories on Barter," *Applied Economics Letters*, 8(5): 351-53.

Marvasti, Akbar (2000) "Resource Characteristics, Extraction Costs, and Discovery of a New Resource Base," *Environmental and Resource Economics*, 17(4): 397-410.

Marvasti, Akbar (2000) "Motion Pictures Industry: Economies of Scale and Trade," *International Journal of the Economics of Business,* 7(1): 99-114.

Marvasti, Akbar (2000) "Waiting Time and Production Uncertainty in Medical Services," *Quality and Quantity: International Journal of Methodology*, 34(2): 115-35.

Marvasti, Akbar and Smyth, David (1999) "The Effect of Barter on the Demand for Money: An Empirical Analysis," *Economics Letters*, 64(1): 73-80.

Marvasti, Akbar (1998) "An Assessment of International Technology Transfer Systems and the New Law of the Sea," *Ocean and Coastal Management*, 39(3): 197-210.

Marvasti, Akbar and Smyth David (1998) "Barter in the U.S. Economy: A Macroeconomic Analysis," *Applied Economics*, 30(8): 1077-88.

Marvasti, Akbar (1996) "Reserve Characteristics and Mining Costs: An Empirical Study of the Phosphate Industry," *Environmental and Resource Economics*, 7(3): 357-73.

Canterbery, Ray, and Marvasti, Akbar (1994) "Two Coases or Two Theorems? A Reply," (with Ray Canterbery), *Journal of Economic Issues*, 28(1): 218-26.

Marvasti, Akbar (1994) "International Trade in Cultural Goods: A Cross-sectional Analysis," *Journal of Cultural Economics*, 18(2): 135-148.

Canterbery, Ray and Marvasti, Akbar (1992) "The Coase Theorem as a Negative Externality," *Journal of Economic Issues*, 26(4): 1179-89.

Marvasti, Akbar and Riggs, Stan (1989) "The U.S. Phosphate Industry: Pressures for Evolutionary Change," *Marine Technology Society Journal*, 23(1): 27-36.

Marvasti, Akbar (1989) "A Conceptual Model for the Management of International Resources: The Case of Seabed Minerals," *Ocean Development and International Law*, 20(3): 273-284.

Marvasti, Akbar (1989) "Alternative Regimes for Exploitation of Manganese Nodules and Their Impacts," *Journal of Policy Modeling*, 10(2): 317-19.

Marvasti, Akbar and Riggs, Stan (1987) "Potentials for Marine Mining of Phosphate in the U.S. Exclusive Economic Zone (EEZ)," *Marine Mining*, 6(3): 291-300.

**Book Chapters:**

Marvasti, Akbar (2013) "The Coase Theorem as a Negative Externality," (with Ray Canterbery), in *The Coase Theorem*, Edited by Richard A. Posner and Francesco Parisi, Edward Elgar Publishing Inc., Northampton, MA.

Marvasti, Akbar (2007) "Nonlinear Regressions," *Macmillan's International Encyclopedia of Social Sciences*, Edited by William A. Darity, Macmillan Reference USA.

Marvasti, Akbar (2007) "Protectionism," *Macmillan's International Encyclopedia of Social Sciences*, Edited by William A. Darity, Macmillan Reference USA.

**Other Publications:**

Marvasti, Akbar (2014) "Crew Injuries and Fatalities, Employment Estimates, and Casualty Rates in the Gulf of Mexico Commercial Fisheries," NOAA Technical Memorandum, March. NMFS-SEFSC-656.

Marvasti, Akbar and Canterbery, Ray (1991) "Intra-industry Trade in Culture: The U.S. and Canada," *Proceedings of the International Trade and Finance Association Meeting*, 159-74.

**PAPERS UNDER REVIEW**

"Minimum Information Management and Price-Abundance Relations in a Fishery".

"A Panel Data Analysis of Anti-dumping Duties in Seafood Trade: A Gravity Model Approach".

"Occupational Safety in Fisheries of the Gulf of Mexico: A Difference-In-Difference Approach".

"Did Tradable Quota Rights Really Affect Feet Size? The Case of IFQ Programs in the Gulf of Mexico," with Sami Dakhlia.

"Risk Perceptions in a Fishery: Is there a Rational Learning Process?".

**WORK IN PROGRESS**

"Risk Assessment and Commercial Fishing Vessel Property Insurance."

"Renewable Natural Resource Scarcity Trends: Evidence from the U.S. Fisheries."

**PRESENTATIONS**

"Risk Perceptions in a Fishery: Is there a Rational Learning Process?". Western Economic Association International, San Francisco, 2019.

"A Panel Data Analysis of Anti-dumping Duties in Seafood Trade: A Gravity Model Approach", Western Economic Association International, San Francisco, 2019.

"Risk Perceptions in a Fishery: Is there a Rational Learning Process?". Eastern Economic Association, New York, 2019.

"Red Snapper and Grouper-Tilefish IFQ Programs and Occupational Fatalities in the Gulf of Mexico," with Sami Dakhlia, Gulf of Mexico Fishery Management Council, Tampa, January, 2018

"Effect of the Government Regulations on the Severity of Injuries in the Gulf of Mexico Commercial Fisheries," Southern Economic Association, Tampa, 2017.

"Occupational Safety in Fisheries of the Gulf of Mexico: A Difference-In-Difference Approach," Western Economic Association International, San Diego, 2017.

"Market for Quota for Red Snapper and Grouper/Tilefish IFQ Programs in the Gulf of Mexico," with Sami Dakhlia, North American Association of Fisheries Economists (NAAFE) meetings, La Paz, Mexico, 2017.

"The Effect of Tradable Fishing Quota on Feet Composition and Risk of Injury: the Case of the Red Snapper Fishery in the Gulf of Mexico," with Sami Dakhlia, International Institute of Fisheries Economics and Trade (IIFET), Aberdeen, Scotland, 2016.

"Red Snapper and Grouper-Tilefish IFQ Programs and Occupational Fatalities in the Gulf of Mexico," with Sami Dakhlia, International Institute of Fisheries Economics and Trade (IIFET), Aberdeen, Scotland, 2016.

"Potential Effects of Global Warming on the Commercial Fisheries of the Southeast U.S. Waters," NOAA Fisheries Climate Socioeconomic Workshop, Seattle, 2015.

"Occupational Injuries in the Shrimp Harvesting in the Gulf of Mexico and the Value of Statistical Life," North American Association of Fisheries Economists (NAAFE) meetings, Kitchikan, 2015.

"Can Time Series Analysis of Price be Useful in Fishing Quota Allocation Decisions in Fishery?," NOAA Fisheries Economic Considerations of Allocation Decisions Workshop, Seattle, 2014.

"An Analysis of Fatal Commercial Fishing Accidents," Southern Economic Association meetings, Tampa, 2013.

"Red Snapper Price Volatility under Individual Fishing Quota Management Regime with Quota Changes and Oil Spill," with Tony Lamberte, Southern Economic Association meetings, New Orleans, 2012.

"Estimating a Structural Model of the Demand for Gulf of Mexico Shrimp" (with David Carter), North American Association of Fisheries Economists (NAAFE) meetings, Honolulu, 2011.

"Estimating Outdoor Recreation Demand: A Revealed Preference Approach," Rosentiel School of Marine and Atmospheric Science, University of Miami, Miami, FL, October 2010.

"Barter and Business Cycles: Further Evidence," with David Smyth, Western Economic Association International meetings, Portland, 2010.

"Occupational Safety and Language Proficiency", International Relations Colloquium of Pomona College and the Department of Economics, Pomona College, December, 2009.

"Occupational Safety and Language Proficiency", Western Economic Association International meetings, Honolulu, 2008.

"An Analysis of Barter in Broadcasting Industry," Western Economic Association International meetings, Seattle, 2007.

"An Econometric Analysis of Ocean Mineral Exploration Activities," Eastern Economic Association meetings, New York, 2007.

"Forecasting Accuracy of Fixed Business Investment vs. Inventory Investment," with David Smyth, Western Economic Association International meetings, San Diego, 2006

"A Welfare Estimation of Beach Recreation Demand with Aggregate Data," Western Economic Association meetings, San Diego, 2006.

"Forecasting Accuracy of Fixed Business Investment vs. Inventory Investment," with David Smyth, International Symposium on Forecasting, San Antonio, 2005

"U.S. Academic Institutions and Foreign-Born Instructors' Language Proficiency," Southwestern Social Science Association meetings, Albuquerque, 2005.

"Estimating Outdoor Recreation Demand: A Revealed Preference Approach," Western Economic Association International meetings, Vancouver, 2004.

"U.S. Academic Institutions and Foreign-Born Instructors' Language Proficiency," Southwestern Society of Economists, Houston, 2003.

"The Role of Barter in the Money-Income Causality," with David Smyth, International Atlantic Economic Conference, Washington D.C., 2002.

"Theory of Endogenous Protectionism: The U.S. Motion Pictures Industry," with E. R. Canterbery, Western Economic Association meetings, Seattle, 2002

"Foreign-born Teaching Assistants and Student Achievement: An Ordered Probit Analysis," Southern Economic Association, Tampa, 2001.

"Foreign-Born Teaching Assistants and the Academic Performance of Undergraduates: A Reappraisal," Western Economic Association meetings, San Francisco, 2001.

"Mineral Prices and Exploration Efforts: Evidence From Patent Activities in Ocean Mining," Western Economic Association meetings, San Francisco, 2001.

"Money-Income Causality in the Presence of Barter," Western Economic Association International meetings, Vancouver, 2000.

"Estimates of Demand and Supply for Physician Services: A Panel Data Analysis," Southern Economic Association meetings, New Orleans, 1999.

"The Demand for Ammonium Sulfate in the U.S.," Western Economic Association International meetings, San Diego, 1999.

"Recycling as a Method of Reducing Hazardous Waste: A Model Applied to Phosphate Industry," Southern Economic Association meetings, Baltimore, 1998.

"The Effect of Barter on the Demand for Money: An Empirical Analysis," with David Smyth, Southern Economic Association meeting, Baltimore, 1998.

"Gravity and Iceberg Models: Applications to the Motion Pictures Trade," with E. R. Canterbery, International Trade and Finance Association meetings, Chicago, 1998.

"A Microeconomic Analysis of Barter in Broadcasting Industry," Southern Economic Association meetings, Atlanta, 1997.

"Cultural Distance and Film Trade," with E.R. Canterbery, Southern Economic Association meetings, Washington D.C., 1996.

"Productivity Change in the U.S. Phosphate Industry," Western Economic Association International meetings, San Francisco, 1996.

"An Estimation of Demand and Supply for Physician Services," Southern Economic Association meeting, New Orleans, 1995.

"Growth of Barter Trade in the U.S. Economy," Western Economic Association International meetings, San Diego, 1995.

"The Impatient Patient: An Empirical Study of Office Waiting, "Southwestern Society of Economists meetings, Houston, 1995.

"A Contingent Valuation of Customer Delay in Medical Services," Southern Economic Association meeting, Orlando, 1994.

"Productivity Bias in the Purchasing Power Parity Theory of Exchange Rate," Western Economic Association International meeting, Vancouver, 1994.

"An Empirical Test of Purchasing Power Parity for Iran," Southern Economic Association meetings, New Orleans, 1993.

"International Trade in Culture: A Cross-sectional Analysis," Application of Social and Economic Research in Economic Development Planning meetings, Tehran, 1992.

"A Welfare Analysis of Patient Waiting Time," Southern Economic Association meetings, Washington D. C., 1992.

"Mineral Prices and Exploration Expenditures," Southwestern Society of Economists meetings, San Antonio, 1992.

"International Trade in Culture: A Cross-sectional Analysis," Southwestern Society of Economists meeting, Houston, 1991.

"Motion Picture Industry: Economies of Scale and Trade," with E. R. Canterbery, Atlantic Economic Association meetings, Washington D. C., 1991.

"Economic Consequences of the Persian Gulf War," panel presentations and discussions on the Gulf War, UH-Downtown, Houston, February 8, 1991.

"Intra-industry Trade in Culture: The U.S. and Canada," with E. R. Canterbery, International Trade and Finance Association meeting, New Orleans, 1991.

"Exploitation of International Common Property Resources: A Public Choice Perspective," with E. R. Canterbery, Southern Economic Association meetings, New Orleans, 1990.

"Waiting Time and Production Uncertainty in Medical Services," Southern Economic Association meetings, Orlando, 1989.

"Intra-Industry Trade Barriers Between the U.S. and Canadian Cultural Industries," with E. R. Canterbery, Eastern Economic Association meeting, Baltimore, 1989.

"Antarctica and International Mobility of Land" with E. R. Canterbery, Eastern Economic Association meetings, Arlington, 1987.

"An Evaluation of International Technology Transfer under the Law of the Sea Treaty", Global Development Conference, Maryland, 1986.

"Alternative Regimes for Exploitation of Manganese Nodules and Their Impacts," Eastern Economic Association meetings, Philadelphia, 1986.

## WORK EXPERIENCE
### Government:

August 2010-Present
Economist (ZP 4)
Southeast Fisheries Research Center
NOAA, Department of Commerce
Miami, FL

### Academics:

Fall 2012-Spring 2017
Adjunct Professor of Economics
Economics Department, University of Miami, Coral Gables

2008-2010 (2009 Tenured)
Professor of Economics

University of Southern Mississippi, Hattiesburg, MS

2006-2008
Associate Professor of Economics
University of Southern Mississippi, Hattiesburg, MS

2005-2006
Visiting Professor of Economics
Pomona College, Claremont, CA

2000-2005
Professor of Economics
University of Houston-Downtown, Houston, TX

1993-2000 (Tenured)
Associate Professor of Economics
University of Houston-Downtown, Houston, TX

1990-1993
Assistant Professor of Economics
University of Houston-Downtown, Houston, TX

1985-1990
Visiting Assistant Professor of Economics
East Carolina University, Greenville, NC

Fall 1984-Summer 1985
Instructor of Economics
Louisiana State University, Baton Rouge, LA   70803

**Consulting:**
2003
Galveston Island Convention & Visitors Bureau- Prepared a report on "Demand Estimate for Apffel Park, Galveston Island.

2002
Medical Equipment Network for the Disabled (MEND Project)- Wrote an extensive needs assessment report to attract funding to a charitable organization: "Needs Assessment: Status of the Disadvantaged Population in the Houston Area."

**Other:**
1974-1976
Served as a supervisor of the Literacy Corps in Sari, Iran, while a Lieutenant in the Iranian Armed Forces.

**COURSES TAUGHT**

Industrial Organization
Business Forecasting
Econometrics

Statistics
Health Economics
Environmental and Natural Resource Economics
Intermediate Macroeconomics
Intermediate Microeconomics
Money and Banking
International Economics (Graduate and Undergraduate)
Global Macroeconomics (Graduate)
Managerial Economics (Graduate)
Economic Processes (Graduate)
Business Economics (Graduate)
Economics of Government Regulations (Graduate)

**PROFESSIONAL STATUS**

A Member of:
American Economic Association
Southern Economic Association
Western Economic Association International
Association of Environmental and Resource Economists
Canadian Economic Association

**SERVICES TO PROFESSION**

Sample of Journal Referee:
Applied Economics, The American Economist, Bulletin of Economic Research, Contemporary Economic Policy, Data in Brief, Economic Change and Restructuring, Eastern Economic Journal, The Economic Journal, Economic Modelling, Empirical Economics, Journal of Economics and Finance, The Journal of Media Economics, Journal of Money Credit and Banking, Journal of Economic Behavior and Organization, Land Economics, Southern Economic Journal, Ocean and Coastal Management.

**OTHER SERVICES**

Media Experiences:
Oregon Public Broadcasting- Topic: Barter and Recession (March, 2009)
Miami Herald- Topic: Barter Transactions (June, 2007)
New York Times- Topic: Barter Transactions (October, 2006)
Christian Science Monitor- Topic: Foreign –Born in Academia (April, 2005)
Wall Street Journal- Topic: Barter Transactions (December, 2004)

**REFRENCES**

Available upon reques.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Akbar Marvasti, a/k/a
Alfred S.,[1]
Complainant,

v.

Wilbur L. Ross, Jr.,
Secretary,
Department of Commerce
(National Oceanic & Atmospheric Administration),
Agency.

Appeal No. 2019001975

Hearing No. 510-2016-00239X

Agency No. 54201500190

<u>DECISION</u>

Complainant filed a timely appeal, pursuant to 29 C.F.R. § 1614.403, from the Agency's October 16, 2018 final order concerning an equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq.

At the time of events giving rise to this complaint, Complainant was employed by the Agency as an Economist, ZP-0110-III, with the Agency's Southeast Fisheries Science Center in Miami, Florida. On July 14, 2015, Complainant filed an EEO complaint alleging discrimination by the Agency on the bases of religion (Muslim) and national origin (Iranian) when he was denied a non-competitive promotion.

After its investigation into the complaint, the Agency provided Complainant with a copy of the report of investigation and notice of right to request a hearing before an Equal Employment Opportunity Commission (EEOC or Commission) Administrative Judge (AJ). Complainant timely requested a hearing. The Agency submitted a motion for a decision without a hearing. The AJ subsequently issued a decision by summary judgment in favor of the Agency.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

The Agency issued its final order adopting the AJ's finding that Complainant failed to prove discrimination as alleged. The instant appeal followed.

The Commission's regulations allow an AJ to grant summary judgment when he or she finds that there is no genuine issue of material fact. 29 C.F.R. § 1614.109(g). An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. Celotex v. Catrett, 477 U.S. 317, 322-23 (1986); Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988). A fact is "material" if it has the potential to affect the outcome of the case. In rendering this appellate decision, we must scrutinize the AJ's legal and factual conclusions, and the Agency's final order adopting them, *de novo*. See 29 C.F.R. § 1614.405(a)(stating that a "decision on an appeal from an Agency's final action shall be based on a *de novo* review…"); see also Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO-MD-110), at Chap. 9, § VI.B. (as revised, August 5, 2015)(providing that an administrative judge's determination to issue a decision without a hearing, and the decision itself, will both be reviewed *de novo*).

In order to successfully oppose a decision by summary judgment, a complainant must identify, with specificity, facts in dispute either within the record or by producing further supporting evidence and must further establish that such facts are material under applicable law. Such a dispute would indicate that a hearing is necessary to produce evidence to support a finding that the agency was motivated by discriminatory animus. Here, however, Complainant has failed to establish such a dispute. Even construing any inferences raised by the undisputed facts in favor of Complainant, a reasonable fact-finder could not find in Complainant's favor.

Upon careful review of the AJ's decision and the evidence of record, as well as the parties' arguments on appeal, we conclude that the AJ correctly determined that the preponderance of the evidence did not establish that Complainant was discriminated against by the Agency as alleged.

Accordingly, we AFFIRM the Agency's final order adopting the AJ's decision.

## STATEMENT OF RIGHTS - ON APPEAL
### RECONSIDERATION (M0617)

The Commission may, in its discretion, reconsider the decision in this case if the Complainant or the Agency submits a written request containing arguments or evidence which tend to establish that:

1.   The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.   The appellate decision will have a substantial impact on the policies, practices, or operations of the Agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision.

A party shall have **twenty (20) calendar days** of receipt of another party's timely request for reconsideration in which to submit a brief or statement in opposition. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at Chap. 9 § VII.B (Aug. 5, 2015). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission. Complainant's request may be submitted via regular mail to P.O. Box 77960, Washington, DC 20013, or by certified mail to 131 M Street, NE, Washington, DC 20507. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The agency's request must be submitted in digital format via the EEOC's Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g). The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0610)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint.**

### RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests.

Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations

January 14, 2020
Date

# NOAA CIVIL RIGHTS OFFICE
## EEO COUNSELOR'S REPORT

| | |
|---|---|
| **EEO COUNSELOR:** | Coneshea V. Simpson |
| **CASE NUMBER:** | 54-2015-00190 |
| **EEO/ADR MEDIATION PROGRAM:** | No |
| **AGENCY:** | Civil Rights Office |
| | Office of the Chief Administrative Officer |
| | 1305 East West Highway |
| | Room 7500 |
| | Silver Spring, MD 20910 |
| **TELEPHONE:** | (301) 713-0548 |
| **FAX:** | (301) 713-0983 |

## PART I. <u>INFORMATION ABOUT THE AGGRIEVED</u>

| | |
|---|---|
| **Name:** | Akbar Marvasti |
| **Title/Series/Grade:** | Economist, ZP-0110-III |
| **Area:** | Southeast Fisheries Science Center |
| **Org. Unit:** | National Marine Fisheries Service (NMFS) |
| **Status:** | Permanent |
| **Home Address:** | 9440 Tangerine Place, #401 |
| | Davie, FL 33324 |
| **Home Telephone:** | (601) 466-0008 |
| **Work Address:** | 75 Virginia Beach Drive |
| | Miami, FL 33149 |
| **Work Telephone:** | (305) 361-4243 |
| **E-Mail:** | akbar.marvasti@noaa.gov |

| | |
|---|---|
| **Anonymity:** | No |
| **Union:** | No |
| **Aggrieved Representative:** | N/A |
| **Address & Telephone Number:** | |
| **Fax:** | |
| **Email:** | |

## PART II. <u>CHRONOLOGY OF EEO COUNSELING:</u>

| | |
|---|---|
| **Date of Initial Contact with EEO Office:** | 6/3/2015 |
| **Contacted Civil Rights Office by:** | Email |
| **Date of Initial Interview with Counselor:** | 6/4/2015 |
| **Date of Alleged Discriminatory Events:** | 5/28/2015 |
| **45th Day After Event:** | 7/12/2015 |
| **Reason for Delay Contact beyond 45 days, if applicable:** | N/A |
| **Extension Granted:** | No |
| **Expiration Date of Extension:** | N/A |
| **Date of Rights & Responsibilities Notice issued:** | 6/4/2015 |
| **Date of ADR Election Form issued:** | 6/4/2015 |
| **Date of Election Notice issued:** | 6/4/2015 |
| **Date Notice of Right to File issued:** | 7/2/2015 |
| **Date Counselor's Report Due to OCR:** | 7/29/2015 |

## PART III. BASES FOR ALLEGED DISCRIMINATION:

National Origin (Iran), Religion (Muslim)

## PART IV. PRECISE DESCRIPTION OF THE ISSUES COUNSELED:

Akbar Marvasti (Aggrieved), an Economist at the Southeast Fisheries Science Center (SEFSC), NMFS, alleges discrimination based on national origin and religion when:

1) On May 28, 2015, he learned that his application package for a promotion to an Economist, ZP-0110-IV, was rejected by Dr. Theo Brainerd, Deputy Science Director; ultimately preventing a review by the Personnel Management Advisory Committee (PMAC), a necessary step in the promotion process.

## REMEDY REQUESTED:

1) A promotion to the ZP-IV.
2) Allow PMAC to review his application package to determine scientific qualifications for a promotion.
3) Allow use of publications completed prior to SEFSC employment as credible research documents required by PMAC.

## PART V. INFORMATION ABOUT THE RESPONDING OFFICIALS:

**Name/Title:**      Matthew McPherson, Director, Social Science Research Group, Southeast Fisheries Science Center (SEFSC), NMFS

**Address:**      75 Virginia Beach Drive
Miami, FL 33149

**Telephone:**      (305) 365-4112

**Relationship
To Aggrieved:**      Immediate Supervisor


**Name/Title:**      Dr. Theo Brainerd, Deputy Director, SEFSC, NMFS

**Address:**      75 Virginia Beach Drive
Miami, FL 33149

**Telephone:**      (305) 361-4284

**Relationship
To Aggrieved:**      Second-line Supervisor

3

**THE COUNSELOR ADVISED THE AGGRIEVED PERSON IN WRITING OF RIGHTS AND RESPONSIBILITIES:**

**PART VI. SUMMARY OF COUNSELOR'S INQUIRY:**

**Initial interview with Akbar Marvasti, the Aggrieved, June 3, 2015.**

Akbar Marvasti (the Aggrieved) alleged that on May 28, 2015, his immediate supervisor, Matthew McPherson, Director, Social Sciences Research Group, provided specifics about why his application package for a promotion was denied a review through the Personnel Management Advisory Committee (PMAC), by Dr. Theo Brainerd, Deputy Science Director. The Aggrieved stated that according to Dr. Brainerd's April 10, 2015 memo, he had not met the requirements outlined in the Southeast Fisheries Science Center's (SEFSC) Research Level Evaluation Procedures. Specifically, the Aggrieved had not produced five (5) mission-related publications within the past four (4) years.

**Note: The SEFSC Research Level Evaluation Procedures outlines the process for evaluating the level of research conducted by scientist, and is used as a component to promotion packages submitted to the Workforce Management Office for career-ladder and non-competitive promotions (accretion of duties).**

The Aggrieved stated that prior to his employment with the SEFSC, he produced several viable publications that were acknowledged by his former SEFSC supervisor, Dr. Jim Waters. The Aggrieved stated that before retiring, Dr. Waters expressed his belief that the Aggrieved was already qualified for the band IV level, but could not be hired at that level because the vacancy announcement, from which he had been hired, was posted as a band III. The Aggrieved further stated that Dr. Waters added language in his 2011 Performance Plan, asserting that his completion of the "demand curve for shrimp" project would justify a nomination for his promotion. The Aggrieved stated that Dr. Waters clearly indicated, verbally and in writing, that his prior academic experience and publication record would qualify him for a promotion shortly after his August 2010 employment with the SEFSC.

The Aggrieved stated that when he reviewed the memo from Dr. Brainerd, he was perplexed by the requirement of mission-related work, since it was never mentioned during his discussions with Dr. Waters, Mr. McPherson, Dr. Peter Thompson (PMAC Chair), or Dr. Brainerd. The Aggrieved insisted that he had several lengthy conversations with management about the PMAC process to verify the requirements for a promotion, and was confident of his approval, based on their feedback. However, when he was informed that his application would not be reviewed by PMAC, based on a preliminary review by Dr. Brainerd, he felt discriminated against based on his religion and national origin. Specifically, he believed that Dr. Brainerd intentionally created a requirement for mission-related publications, knowing that the Aggrieved was unaware of and could not meet the requirement.

The Aggrieved also mentioned that initially, Mr. McPherson supported his promotion package, and then later expressed doubt about it meeting the required criteria. However, after further discussion with the Aggrieved, Mr. McPherson acquiesced. The Aggrieved stated that

Mr. McPherson's wavering support has led him to believe that he was assisting Dr. Brainerd in denying his promotion to the band IV.

**Interview with Matthew McPherson, Director, Social Sciences Research Group, SEFSC, NMFS, June 12, 2015.**

Mr. McPherson supervised the Aggrieved for nine (9) month, and was aware (through conversations with the Aggrieved) that Dr. Waters believed that he qualified for a promotion to the band IV. Mr. McPherson asserted that he did not have a conversation with Dr. Waters about promoting the Aggrieved, nor was it promised in writing.

Mr. McPherson stated that he initially supported the Aggrieved promotion package, but after further review, realized that although he was a highly qualified researcher, his latest publications were not related to fisheries. Mr. McPherson added that this caused him to doubt that the Aggrieved publications could be used to meet the PMAC requirement of five (5) peer review publications. However, when he approached the Aggrieved about his concerns, he did not agree with his interpretation. Therefore, Mr. McPherson agreed to submit the necessary supervisory recommendation and other documents, believing that the Aggrieved deserved the opportunity to have the PMAC review his package and make the final decision.

Mr. McPherson stated that when he received the memo from Dr. Brainerd explaining that the promotion package would not be reviewed by the PMAC, he believed it was strictly based on the lack of mission-related publications. Mr. McPherson added that he hoped at least one of the publications, closely related to fisheries, would be accepted, but it was published beyond the timeframe of four (4) years.

Mr. McPherson confirmed that since his employment with the SEFSC in October 2014, he recommended two (2) employees (including the Aggrieved) for a promotion; of which one (1) had mission-related scientific research, which was classified at the next grade level by the PMAC.

Mr. McPherson reiterated that the Aggrieved produced many reputable publications, but none were mission-related. He also added that he had extensive discussions with the Aggrieved about publications; suggesting ways to complete mission-related publications within shorter timeframes, in order to meet the requirements for a promotion. Mr. McPherson stated that the Aggrieved was currently working on mission-related publications, but they were not yet completed. He added that he did not believe the Aggrieved could be promoted internally for work accomplished outside of NOAA, unless it was fisheries-related.

**Interview with Dr. Theo Brainerd, Deputy Science Director, SEFSC, NMFS, June 15, 2015.**

Dr. Brainerd has served as the Deputy Science Director since 2008, and was aware (through conversations with the Aggrieved) that Dr. Waters promised to promote him to the band IV grade level. Dr. Brainerd confirmed that his role in the PMAC process was to ensure that

packages included all of the required materials, prior to submission to the committee for scientific evaluation.

Dr. Brainerd stated that when he reviewed the titles and abstracts of the publications submitted by the Aggrieved, he realized that none of them were mission-related, which was one of the requirements for a promotion based on an accretion of duties. Dr. Brainerd stated that after his initial review, he met with Dr. Thompson and concurred that the package did not include the required number of mission-related publications. Dr. Brainerd stated that the decision was not based on national origin or religion, and he was unaware of the Aggrieved's religion.

Dr. Brainerd added that although the Aggrieved was hired without mission-related publications, it was expected that he would obtain them sometime afterwards. However, the Aggrieved had not published any mission-related publications within his five (5) years with the SEFSC.

Dr. Brainerd stated that although the PMAC evaluation procedures do not specifically outline the need for mission-related work; because the promotion is based on an accretion of duties, it is assumed. Dr. Brainerd added that it would be unreasonable for an employee to expect a promotion, through an accretion of duties, for work performed prior to employment with the agency. He further explained that the PMAC included peer scientist assigned to review mission-related work to determine if it met higher graded scientific work.

Dr. Brainerd stated that in 2011, the Aggrieved (during his probationary period) mentioned that he should be promoted to the band IV level. At that time, and for many years since, even though he explained the PMAC process to the Aggrieved, he insisted that he was already qualified, despite the lack of mission-related publications.

Dr. Brainerd confirmed that in the past two (2) years, he recalled receiving 21 applications for promotion. Of those, 11 were submitted to the PMAC; 10 were successfully promoted and one (1) was denied. Dr. Brainerd asserted that the Aggrieved was the only employee requesting a promotion and claiming no knowledge of a requirement for mission-related publications.

**Interview with Dr. Peter Thompson, Director of Operation Management & Information/PMAC Chair, July 1, 2015.**

Dr. Thompson has served as the PMAC Chair since 2005.

Dr. Thompson stated that although mission-related research is not directly outlined in the PMAC evaluation procedures, it is assumed and required to determine the caliber of research. Dr. Thompson stated that since the promotion is based on an accretion of duties, the committee needs to be able to identify research completed since employment with the agency.

Dr. Thompson stated that since PMAC was on hold for several years, he had many conversations with the Aggrieved about how the process worked, and had recommended that he publish documents while PMAC was on hold, so that he would be ready once it was re-established. Dr. Thompson stated that during his conversations with the Aggrieved, he did not recall specifically mentioning the requirement of mission-related work, but it is understood that peer

scientists reviewing packages would not be familiar with external/non-related research, and would not be able to identify and assess work performed at the band IV level within NOAA/SEFSC.

Dr. Thompson stated that even if Dr. Waters had promised the Aggrieved a promotion, he would still be required to go through the PMAC process.

**Follow-up with Akbar Marvasti, Aggrieved, July 23, 2015.**

The Aggrieved stated that he never had conversations with Dr. Brainerd about the requirement for mission-related work for a promotion. The Aggrieved also stated that he believed that Dr. Brainerd, along with Mr. McPherson and Dr. Thompson met and agreed on reasons to deny his promotion, prior to the submission of his application.

The Aggrieved stated that he believed it was important to produce high quality publications, rather than completing low caliber research. Therefore, it has taken him longer to produce mission-related publications. For this reason, he insisted that his work, prior to NOAA, should have been accepted for review by the PMAC.

**PART VII. <u>SUMMARY OF INFORMAL RESOLUTION ATTEMPT:</u>**

The EEO Counselor advised management of the requested remedies. Management did not agree to the remedies sought by the Aggrieved.

**CLOSURE:**

The Aggrieved was advised of the results of the inquiry. The Aggrieved was dissatisfied with the response from management. On July 2, 2015, the Notice of Right to File a Discrimination Complaint, including a Formal Complaint of Discrimination was issued. The Aggrieved was advised that he had 15 calendar days from receipt of notice to file a formal complaint.

Coneshea V. Simpson
Name of EEO Counselor

7/28/2015
Date

Signature of EEO Counselor

**Attachments**


1. Rights and Responsibilities/Election Forms
2. Notice of Right to File



National Oceanic and Atmospheric Administration
OFFICE OF THE CHIEF ADMINISTRATIVE OFFICER
CIVIL RIGHTS OFFICE

July 2, 2015

Dr. Akbar Marvasti
9440 Tangerine Place, #401
Davie, FL 33324

Re: Notice of Right to File a Discrimination Complaint within 15 Calendar Days

On June 3, 2015, you contacted the NOAA Civil Rights Office alleging discrimination based on national origin (Iran) and religion (Muslim) when you were denied a promotion to the position of Economist, ZP-0110-IV, by Dr. Theo Brainerd, Deputy Director, Southeast Fisheries Science Center, NMFS.

These matters have not been resolved. Thus, I am required to conclude EEO counseling and give you this Notice.

**You have the right to file a discrimination complaint within 15 calendar days of your receipt of this notice by using the enclosed Complaint Form CD-498, or by writing a letter which contains the same information requested in the CD-498.**

The complaint must be filed in person or by mail with either:

> Suzan Aramaki, Director
> Office of Civil Rights, Department of Commerce
> Swing Space - Floor C - Suite 200
> 14th Street and Constitution Avenue, NW
> Washington, DC 20230

>        or

> Joseph E. Hairston, EEO Officer
> National Oceanic Atmospheric Administration
> CRO, SSMC4 - Room 7500
> 1305 East West Highway
> Silver Spring, MD 20910



Attachment 2

You must notify the Agency immediately if you decided to retain counsel or a representative for your discrimination complaint. The name, address and telephone number of such representative must be provided in writing, along with your signature and date, to the Compliance Division, Office of Civil Rights, U.S. Department of Commerce, Herbert Hoover Building, Room 6010, Washington, D.C. 20230.

If you have any questions, I can be reached at 1-800-452-6728 or at 301-713-0500.

Sincerely,

Coneshea V. Simpson
EEO Counselor

Attachment
CD-498 Complaint Form

*Promotion Communication
with The Center Director*

**Subject:** Re: Promotion
**From:** Akbar Marvasti <akbar.marvasti@noaa.gov>
**Date:** Mon, 14 Jan 2013 09:04:40 -0500
**To:** Bonnie Ponwith - NOAA Federal <bonnie.ponwith@noaa.gov>

Thank you.
Akbar

On 1/12/2013 4:53 AM, Bonnie Ponwith - NOAA Federal wrote:

> Hi Akbar -
>
> I had a meeting scheduled this week to get updates, but it had to be postponed, due to the illness of some participants. I'll be back to you with an update as soon as I can hold the meeting.
>
> Bonnie
>
> On Tue, Jan 8, 2013 at 9:11 AM, Akbar Marvasti <akbar.marvasti@noaa.gov> wrote:
>> Good Morning Bonnie,
>>
>> Thank you again for the opportunity to discuss my promotion issue in November. I wonder if you have any information regarding when I can apply for the promotion.
>>
>> Best,
>> Akbar
>>
>> On 11/8/2012 10:58 AM, Bonnie Ponwith wrote:
>>> Excellent - I've got us locked in for 11:00 in my office, then.
>>>
>>> Bonnie
>>>
>>> On Thu, Nov 8, 2012 at 10:55 AM, Akbar Marvasti <akbar.marvasti@noaa.gov> wrote:
>>>> Hi Bonnie,
>>>>
>>>> 11:00 is fine too. Thanks.
>>>>
>>>> Akbar
>>>>
>>>> On 11/8/2012 10:34 AM, Bonnie Ponwith wrote:
>>>>> Hi Akbar -

I've made an error on my calendar and have a long-standing conference call at the time we agreed to for our conversation. May I shift our meeting to 11:00 a.m. the same day (Friday, 16 Nov)?

Bonnie

On Mon, Nov 5, 2012 at 9:09 AM, Akbar Marvasti <akbar.marvasti@noaa.gov> wrote:
> Hi Bonnie,
>
> That is fine. Thank you.
>
> Akbar
>
> On 11/4/2012 6:23 PM, Bonnie Ponwith wrote:
>> Hi Akbar -
>>
>> I can meet with you at 9:00 a.m. on 16 November. Let me know if that works for you and I'll lock it down.
>>
>> Bonnie
>>
>> On Thu, Nov 1, 2012 at 9:19 AM, Akbar Marvasti <akbar.marvasti@noaa.gov> wrote:
>>> Hi Bonnie,
>>>
>>> Please give me an appointment to discuss my long awaited promotion with you.
>>>
>>> Best Regards,
>>> Akbar Marvasti
>>
>>
>>
>> --
>> *********************************************
>> Bonnie J. Ponwith, Ph.D., Dir
>> Southeast Fisheries Science Center
>> NOAA Fisheries
>> 305-361-4264

--
*********************************************
Bonnie J. Ponwith, Ph.D., Dir
Southeast Fisheries Science Center
NOAA Fisheries
305-361-4264

--
*********************************************
Bonnie J. Ponwith, Ph.D., Dir
Southeast Fisheries Science Center
NOAA Fisheries
305-361-4264

--
*********************************************
Bonnie J. Ponwith, Ph.D., Dir
Southeast Fisheries Science Center
NOAA Fisheries
305-361-4264

*Promotion Communication with the head of promotion Committee (PMAC)*

**Subject:** Promotion
**From:** Akbar Marvasti <akbar.marvasti@noaa.gov>
**Date:** Thu, 03 Mar 2011 09:30:27 -0500
**To:** Peter Thompson <Peter.Thompson@noaa.gov>

Hi Peter,

Please let me know when I can come by your office again to discuss the process of requesting a promotion.

Thanks,
Akbar

**Subject:** Re: Promotion
**From:** Akbar Marvasti <akbar.marvasti@noaa.gov>
**Date:** Fri, 04 Mar 2011 09:04:34 -0500
**To:** Theo Brainerd <Theo.Brainerd@noaa.gov>

That is fine. Thanks.

Akbar

On 3/4/2011 6:05 AM, Theo Brainerd wrote:

Akbar ---  If it has to be on Monday the only time slot I have is 8:00 a.m.  -
8:30  a.m.  Let me know if that's is fine with you.
Theo

On 3/3/2011 2:18 PM, Akbar Marvasti wrote:
Hi Theo,

I had a meeting with Peter this afternoon about my promotion application. PMAC
is a possibility. Given, the approaching deadline, please give me an
appointment for Monday.

Thanks,
Akbar

On 2/23/2011 11:20 AM, Theo Brainerd wrote:

O.K., give me a reminder then.

On 2/23/2011 11:13 AM, Akbar Marvasti wrote:
Hi Theo,

Of course, I will remind you of it.

Akbar

On 2/23/2011 11:07 AM, Theo Brainerd wrote:

Akbar ---  Thanks for asking.  This week my calendar is pretty full.  I
have meetings all day the next two days.  Next week, I'll be out on
travel.  Can it wait until the week of March 6th?
Theo

On 2/23/2011 9:13 AM, Akbar Marvasti wrote:
Hi Theo,

Please give me an appointment sometime this week to discuss my
promotion application.

Thanks,
Akbar

subject to change. If you are busy, a response to this email would suffice.

With Regards,

Akbar Marvasti

**Subject:** Re: Promotion
**From:** Akbar Marvasti <akbar.marvasti@noaa.gov>
**Date:** Mon, 07 Mar 2011 13:48:41 -0500
**To:** "Benita.D.Parks" <Benita.D.Parks@noaa.gov>
**CC:** 'Theo Brainerd' <Theo.Brainerd@noaa.gov>, 'Peter Thompson'
<Peter.Thompson@noaa.gov>

Ms. Parks,

Thank you for your clarification comments. I had no familiarity with the Federal
Government personnel policies when I was hired and assumed what I was told
was true. Now it appears that I have been misled. While I am very disappointed, it
appears that I have to let it go this year.

Akbar

On 3/7/2011 11:32 AM, Benita.D.Parks wrote:
Mr. Marvasti, you misunderstood what our conversation was this morning, you
have two separate issues going :
First, you are on probationary period, due to being you being new to
government you have to serve a year probationary period, effective 8/2/2010.


Also the second issue you were selected for Economist, ZP-0110-3 with
promotion potential to Band 4.  The regulations reads:   You may be promoted
in this position without further competition to the ZP-0110-4 level subject
to a determination that you have met the regulatory requirements for
promotion, you are performing the work of the higher grade level, and you
are recommended by your supervisor.  Promotion is not guaranteed nor is a
promise of promotion implied.

If you have additional questions concerning your first issue which is your
probationary period, you can contact me.  If you have questions concerning
your promotion potential you can contact your supervisor.  Thanks


-----Original Message-----
From: Akbar Marvasti [mailto:Akbar.Marvasti@noaa.gov]
Sent: Monday, March 07, 2011 9:43 AM
To: Theo Brainerd
Cc: Peter Thompson; Benita D Parks
Subject: Promotion

Hi Theo,

Thank you for your time to discuss my intention to apply for promotion this
year. I just spoke with Ms. Parks regarding my promotion application. She
stated that the probationary period does not preclude me from getting
promoted. However, I cannot move to the next pay band till I have served for
a year in the current pay band. Therefore, the effective time of the PMAC
decision is critical.

I like to have another meeting with you to discuss whether I have your
support to go through the PMAC and if the effective date of promotion is

*Promotion Communications with the NOAA Workforce management*

Peter,

Thank you for your email. I will wait for the verdict from WFMO to begin the process for PMAC. I am worried for the lengthy time will be out of the building.

Best,
Akbar

On 2/6/2012 10:58 AM, Peter Thompson wrote:

> Akbar:
>
> Thanks--I received an e-mail from Sharon Turner --you are indeed a ZP3/ZP4--this is good news. Following the process we currently have in place and have been using in the past--this would mean going thru PMAC and then submitting paper work without going thru the Accretion of Duties process---please keep in mind that we are still awaiting the verdict from WFMO on how PMAC plays into promotions.
>
> Thanks
>
> Peter
> On Mon, Feb 6, 2012 at 9:31 AM, Akbar Marvasti <akbar.marvasti@noaa.gov> wrote:
>> Thank you, Peter. I found a copy of my SF 50 that might interest you. I will drop by a copy.
>>
>> Best,
>> Akbar
>>
>> On 2/3/2012 1:33 PM, Peter Thompson wrote:
>>> Sharon:
>>> Good afternoon.  I have cc'd Dr. Akbar Marvasti on this e-mail--can you please let us know if his current position is a career-ladder position (ZP 3/4)?
>>> Thanks as always.
>>> Peter

**Subject:** Re: Email Address
**From:** Akbar Marvasti <akbar.marvasti@noaa.gov>
**Date:** Mon, 18 Mar 2013 15:36:11 -0400
**To:** Peter Thompson - NOAA Federal <peter.thompson@noaa.gov>

Thanks. This is the same page that I had looked at myself. It appears that Jim Faulkner would be the right person to contact.

What is your opinion?

Akbar

On 3/18/2013 2:53 PM, Peter Thompson - NOAA Federal wrote:

> Akbar:
>
> Good afternoon. You may want to go to the following link:
> http://www.wfm.noaa.gov/contact_lists.html
>
> I think "Staffing Services/Kansas City" would be the place to Look.
>
> Peter
>
> On Mon, Mar 18, 2013 at 2:19 PM, Akbar Marvasti <akbar.marvasti@noaa.gov> wrote:
> > Hi Peter,
> >
> > I wonder if you have received information about the head of the HR department for Ms. Loyce Smith.
> >
> > Akbar

**Subject:** PMAC
**From:** Akbar Marvasti <akbar.marvasti@noaa.gov>
**Date:** Fri, 26 Apr 2013 10:56:50 -0400
**To:** Peter Thompson <Peter.Thompson@noaa.gov>

Hi Peter,

Please send me a copy of the PMAC form and a link to the WFM on the topic of promotion. I could not find this information on their web site.

Thanks,
Akbar

The followings are the bullets of my experiences at NOAA in a rather chronological order, suggesting a pattern of discrimination:

• During my job interview, Juan Agar, an economist at NOAA Social Science Group, at lunch time, when he was talking to me alone in the corner of the room, ridiculed my religion and laughed. I brought this to the attention of Jim Waters at the time- July 2010. No action was taken by Jim Waters to my knowledge.

• After the job interview, Jim Waters offered the job to me at the maximum salary of rank ZP III, with a promise of promotion to the rank of ZP IV based on my stature within a year. (A representation at hiring, which was not followed.)- August 2010.

Since January 2011, in numerous occasions I have brought the issue of my promotion to the attention of my superiors at all levels.

• At a conference in Seattle, Washington, in a group meeting of 20 economists, Larry Perruso, an economist in our group, belittle me with his comments. In response to my statement that I am not a child to be directed, he said: "if you want to be an ass about it, ..." Later that day, he approached me while we were waiting for the shuttle to go back to the hotel and commented that " I am done with you. You will never get data from me." It turned out that Larry was probably drunk during the meeting because a colleague of mine told me later that Larry has drinking problem. I reported the incident to Jim waters, but nothing happened to Larry—September 2010.  Larry became cooperative with me over time , but for about a year when he recently became my acting supervisor, he gave me a hard time again, especially with clearing of a manuscript.

• In several occasions, Juan acted like a bully towards me. Occasionally as a group with other NOAA employees, we hanged out together, including playing soccer. Once the social scientists as a group went to a Peruvian restaurant in Miami for dinner and drinks.  While at the table, Juan pointed out to a picture of a black man on the wall and commented that Akbar should date this guy and laughed laud- October 2010.

• In a routine soccer game that typically some UM students, UM faculty, and NOAA employees played together, Juan deliberately kicked me on my knee. This was after I had spent thousands of dollars on a cartilage transplant surgery. As a result, I went through more surgeries and have not been able to play soccer again.

• Juan had made similar insulting comments about my simple friendship with a black NOAA employee, who occasionally came to my office to visit- 2010, 2012.

• Juan's office is next to mine in the economists' suite. One day, right before taking the acting supervisor position, he commented about my papers that "wait till I become a supervisor and go through your writings." Followed by his usual laughter- November 2010.

1

• By the end of 2010, Jim Waters retired and Juan Agar became my acting supervisor for approximately two years. He gave me a hard time as a supervisor and continued to make derogatory comments from time to time. For example, under Jim waters, as I was taught, I filled out an accurate time sheet. Juan rejected my very first time sheet under him and held it for a few days. Then, he asked me to always enter 9-6 for each day, regardless of my actual working hours. Apparently, this was based on Theo Brainerd's directive to him, the deputy director in Miami- Jan. 2011.

• I went to Theo Brainerd's office to discuss my problems with Juan twice early in Juan's supervision period over a couple of months period. The second time, Theo told me that he does not have time and I need to see Juan about my problems. I never went to Theo's office for consultation. Instead, I used Peter Thompson, who seems to hold a position under Theo and is more friendly- April 2011.

• As promised by Jim Waters when I was hired, I began my work at NOAA with an economic analysis of the Deep Water Horizon oil spill. But, once Juan took over, I was told by both Juan and Theo that I cannot analyze the 2010 event because of the sensitivity of the topic and need to limit my study to pre-oil-spill period. Later in 2011, Juan did not even allow me to create a tech memo based on my pre-oil spill period research. So no output based on that work was created.

• Christopher Liese, an economist in our group, was promoted to ZP IV rank in the same year I was promised to be promoted (2011) based on only two publications as is evident in the list of SSRG publications.

• Christopher Liese told me that he has never seen any new hire being given such a hard time and he does not understand why- August 2011.

• I was talked into writing a time-consuming economic analysis for dolphins in Virginia waters (outside of our Southeast territory). In 2011, Juan promised that it would be a promising topic for my future research. A few months later when the headquarter announced one million dollars grant available for mammal research, in response to my request to write a proposal, he said that this is not an area of interest to the Southeast fishery. I also receive nearly no assistance/training from him in performing my economic analysis- 2011-2012.

• I wrote a grant proposal on occupational injuries in fisheries. In a bathroom conversation, Juan told me that he is interested in the topic. I decided to put his name on my well-written proposal to improve my chances. The proposal later got rejected on incorrect argument about data availability- 2012. (Also, the approval process for another grant proposal the year before was dragged on for a few months, before was approved in the following year.)

• Juan has been teaching for a few years at the Marine Policy Department of UM with just a verbal approval from his supervisor. When I requested to teach at the UM Economics Department, I was referred to the Legal Council in the head quarter in DC to get a formal approval. Later he may have got a similar approval- 2012.

• A statistician colleague across the hall in four occasions has made insulting comments about me being an Iranian and a Muslim in the bathroom, when nobody else has been present, typically after a terrorism incident occurs. I have thought about complaining, but I don't want to live in a more uncomfortable environment than what I have been experiencing. Also, I occasionally need his help- 2013.

An update on this issue is that I finally complained to Peter Thompson. He called for a meeting with him where he apologized and said he did not mean it.

• Never been paid for journal submission fees (only recently I was paid for one submission fee), association membership fees, or business cards. A few months ago after repeated complaints to Peter Thompson regarding this matter, he asked for a judgment from a NOAA budget specialist in D.C. Such a payment is apparently would be approved. It is ironic that NOAA has difficulty approving payment of submission fees to academic journals, while in our unit, they have purchased two automatically adjustable desks at about $900 each, and a comfortable sectional leather sofa (for lying down to read or to sleep) for my colleagues. Ironically, this colleague mostly teleworks and is in his office only three hours a day (9-12).

• There are variations in implementing computer security (MacAfee Endpoint Encryption- requires repeated logins when computer is idle for a few minutes) and downloading programs privileges in our building. I am subject to most restrictive policies. Most of my colleagues' computers are not required to get administrative password to install software. I sometimes have to wait for a couple of days or longer to get an Itech staff to install a software for me. Also, Larry, who another economist in the unit, who has a similar laptop computer to mine, like others in my unit, he does not have MacAfee Endpoint Encryption on his computer. Update—in the last few months, perhaps as a result of my repeated emails on this matter, it appears the computer security logins are more uniformly applied.

In recent exchange of emails and conversations with colleagues, it became evident that others in my unit, and possibly throughout the SEFSC have the privilege to install software on their computers. The itech staff typically has left my emails questioning on the fairness of their policy unanswered. It appears that as of November 21, 2014, the policy of not granting the administrative privilege to all employees has been implemented after my repeated complaints.

• I formally requested a meeting with Bonnie Ponwith, our Center director, to discuss my promotion delay and intimidations and ridicules by Juan. She told me that I can put my complaints about Juan in writing and present it to her. I told her that I might do that, but I don't want to hurt Juan and want to live in a peaceful work environment- December 2012.

• In 2013, in a series of emails and phone calls, I have complained to the Workforce Management regarding my promotion. While Loyce Smith of the Workforce Management was initially sympathetic, no action has been taken. My more recent emails to higher ranked officers in Workforce Management are unanswered.

opened for nearly four years, was finally filled by moving a supervisor from the Northeast office in September 2014. He is not an economist, but well qualified for the job.

• In a conversation on January, 8th, 2015, Kenneth Keene, told me that a few years ago he was promoted based on only a letter of recommendation from his supervisor and approval by Theo. It is notable that Kenneth is not a scientist.

• I believe that my annual performance ratings by Juan have been too low given my accomplishments in the last two years. My formal protests did not lead to change of scores or dissipation of mean or standard deviation for my group or the organization-2011, 2012.

• Out of frustration with unsuccessful attempts to get the promotion process working at SEFSC, I initiated a contact with Kathy Sullivan, the NOAA Under Secretary of Commerce, in October 2014. Her initial reaction was warm and supportive, promising to have her staff to look into the issue. Later that month, while the Director at the SEFSC called for a meeting of the interested employees, where she suggested that progress is made in getting the promotion process activated again, it was not clear whether the process will begin this year and how she will handle the situations where employees have been waiting for years to get promoted. I sent a follow up email to Dr. Sullivan in early November. She did not respond.

• I have been treated exceptionally harshly in the NOAA standard manuscript review process, which requires any manuscript to go through a two-stage un-blinded review process by the immediate supervisor for technical issues, and by Alex Chester, a former SEFSC Deputy Director, for editing. I submitted a manuscript on time-series analysis of red snapper on September 2, 2014. The manuscript was initially reviewed by Larry, my acting supervisor at the time, and received about 12 comments/corrections., which I quickly responded. The manuscript is yet to be cleared as of December 4st by my supervisor in the first stage.  A NOAA Research Council guideline document recommends a maximum of thirty days for the duration of this process. After a month passed, I pointed out the violation to this document. So far, it has made it worse as the manuscript has gone through four reviewers so far (two supervisors and two colleagues) in the first stage with a total of approximately sixty comments/corrections on the manuscript and a separate three-page comment by Juan. Overwhelming majority of the comments is of editorial nature. The NOAA Research guidelines recommends that any objections to a manuscript must be of scientific nature. It is notable that when a manuscript is stuck in the review process, it can be argued that the output is not produced. In fact, I have been rated poorly in my annual evaluation and I am in the grievance process.

• I have been verbally abused by another colleague a few months ago (about August, 2014) from the Itech department in the bathroom. The comments have been related to terrorism and ISIS in Iraq, because of my religion. Again, I have sent emails to management (Peter Thompson). Subsequently, he has set up a meeting and discussed the matter between us. The individuals did not deny having made the statements and apologized.

• I am the only member in my group who is working in an office with no windows. My requests to change my office have been ignored by Peter Thompson.

• At least two staff members in our building (SEFSC) have been promoted in the last year by giving them supervisory positions. In my unit, the supervisory position, left

EEO Commission:                                    March 15, 2019

Thank you for the opportunity to provide an update on the treatment I have been receiving at the
SEFSC, NOAA. While a few months ago I finally received a promotion after meeting the SEFSC's
continuously evolving promotion requirements, I was awarded a salary increase of only $6,000.
Therefore, the large gap, now at approximately $35,000, remains between my salary and those of my
colleagues with half as much experience and scientific accomplishments. As a result, the total losses as a
result of refusing to promote me a few years ago have continued to grow. I have also had a productive
year in term of research by having new papers accepted for publication in academic journals, which is in
part due to working substantially more than 40 hours a week at will.

The discrimination continues in terms of providing resources such as financial support for research. Such
funding affects data collection through distribution of survey instruments and ability to attract
collaborators from the academic community, which over time has an impact on research productivity
and advancement. A request by the EEO Commission from NOAA will demonstrate a great disparity in
funding since my employment in spite of numerous funding requests submitted.

Sincerely,


Akbar Marvasti
Economist
SEFSC, NOAA

I was a tenured professor of economics at the University of Southern Mississippi with a nine-month salary of approximately $95,000 in 2010. I made additional $12,000 for teaching two classes in the summer. Of course, I was allowed to occasionally do consulting as well. In 2009, because of the budgetary issues at the state level and a new Dean of College of Business, who was an antagonistic towards the Economics Department, the University decided to eliminate the Economics Department. However, after some negotiations with the Economics faculty, USM considered keeping four professors, including me, who did not qualify to retire, if the remaining faculty members agree to retire voluntarily. Although four younger faculty members agree to stay and rebuild the department in the future, within a few months, three of my colleagues, three of my colleagues took jobs elsewhere and left. I was transferred to the Political Science Department, along with two economics degree programs. I still had a secure tenure position and enjoyed life in Hattiesburg, where I had who I owned a beautiful house on a gulf course. However, academically USM was not a viable environment for me and I did not trust the upper administration. Therefore, I accepted a job offer from NOAA in Miami, FL, where I have some relatives, including my mother.

The job advertised at Southeast Science Fisheries Science Center (SEFSC) in Miami, was at ZP III with the maximum salary of $94, 645. I was brought in to Miami for a job interview and during my subsequent negotiations on the phone with Dr. Jim Waters, who at the time was the supervisor of the Social Science Research Group (SSRG) at NMFS in Miami, FL, I argued that given my current salary at USM and the cost of living in Miami, the salary is not sufficient for me to take this job. His response was that based on your 'stature' (I suppose he meant my rank and job experiences in the academics), you deserve employment at ZP IV rank. He added that, at this time, the maximum salary I can offer you is the top salary at ZP III. He also told me that by March 2011, you should apply for a promotion based on your 'stature' and by August 2011 you will be promoted to ZP IV rank. After apparently discussing the matter with the Workforce Management and his superiors at the SEFSC, he told me that I cannot guarantee the promotion, but I believe that because of your 'stature' you will be promoted in the first year of your appointment. Jim said that legally, however, I cannot put such statement in the contract. The most I can put in the contract is eligibility. Actually he put another statement in the appointment letter that "you are performing the work of the higher grade level." In practice, we are six economists in the SSRG, who perform similar tasks of reviewing amendments and conducting research. Though a couple of us also engage in data collection, they do less research. Besides, data collection is not necessary a higher-grade activity. Most of my economics colleagues are in ZP IV. Technically, none is an economist. They are fishery or agricultural economist. Even one of them has a PhD. In political science, but has apparently had a few courses in economics. Also while I have more than 25 years of job experience, held the rank of full professor in the past at three academic institutions, the longest job experience of my colleagues is less than half of mine. Furthermore, I have numerous publication records, while all of my colleagues have very few publications in lesser known journals.

Unfortunately, Jim Waters retired in December 2010 and Juan Agar, one of my colleagues, became the acting supervisor.

Juan during my job interview time in Miami, during a buffet lunch found me alone in a corner and made some comments about me being a Muslim Shiett and laughed. After the interview, when I got back to Hattiesburg, I told Jim Waters about the incident. He took no action to my knowledge and since I wanted to get the job offer, I did not want to peruse the matter legally. After my employment, especially after he became my acting supervisor, for about one and a half years, he gave me a hard time, occasionally making derogatory comments, though no longer about my religion. I have told upper administration (Theo, and Peter), including the head of SEFSC, Bonnie, about my experiences. When, I formally requested a meeting with Bonnie a few months ago, she told me that I can put it in writing and present to her. I told her that I don't want to hurt Juan and want to live in a peaceful work environment. I also was aware of the 45 days time window from the last incident to make a complaint. I suspect that Juan was given a verbal warning. And subsequently he was asked to step down as acting supervisor and since November 2012, Christopher Liese, another one of my colleagues is the acting supervisor. Although, Juan is in an office next to me, he avoids conversations with me for the fear of saying something stupid and loudly laugh, which is his nature.

Since January 2011, in numerous occasions I have brought the issue of my promotion to the attention of all levels of my supervisors. In the very first year, I was told that Jim Waters should not have promised you because you cannot apply for promotion, while you are working in the one-year probationary period. I am not sure whether the regulation refers to applying in the first year or being promoted in the first year. I decided to follow their advice and wait for the following year. However, since that time my higher ranked supervisors, such as Peter Thompson, have been telling me that NOAA Workforce Management has put the PMAC, which is the process of promotion at NOAA through an advisory committee. I am not aware if there are other methods.

Because of my salary cap, I have not received any salary increase, except I think a $500 this year for COLA. In 2012. I received only $1,000 in bonus as Juan was stepping down and perhaps there was a fear of my objection to bonuses given to others. (I have grieved my annual ratings twice under Juan. No revision was made.) Because of false promises of Jim Waters and lack of follow up by my other supervisor, I have lost thousands of dollars in salary and even ended up filling for bankruptcy as I could not sell my house in Hattiesburg. In the last few moths, I have been complaining to the Workforce Management. While Loyce Smith was initially sympathetic, no action is taken. My more recent emails to higher ranked officers in Workforce Management are unanswered. A statistician colleague across the hall in four occasions has made negative comments about me being an Iranian and a Muslim in the bathroom when nobody else has been present. I have thought about complaining, but I don't want to live in a more uncomfortable environment than I already have.

Best Regards,

Akbar Marvasti

**From:** Akbar Marvasti - NOAA Federal akbar.marvasti@noaa.gov 
**Subject:** File
**Date:** April 9, 2020 at 11:30 AM
**To:** Akbar Marvasti marvastia@gmail.com

---

2/9/2017     National Oceanic and Atmospheric Administration Mail - FY11 performance plan



Akbar Marvasti - NOAA Federal <akbar.marvasti@noaa.gov>

## FY11 performance plan
1 message

*My hiring Supervisor, who retired after hiring me*

Jim Waters <Jim.Waters@noaa.gov>       Fri, Nov 26, 2010 at 1:37 PM
To: Akbar Marvasti <Akbar.Marvasti@noaa.gov>

Hi Akbar,

We still have to finish your performance plan for FY11. The attached files include the performance plan (in pdf format) and my supplemental guidance (in doc format) that discusses my expectations for each assignment. The supplemental guidance is written to you, but also should be useful for the new supervisor.

I need several things from you.

- Each element needs points to be assigned to it, and I would like your recommendations. At the end of the FY, performance for each element will be scored separately and the points serve as weighting factors in the computation of the overall score. There are 4 performance elements and the sum of the points must equal 100. The maximum allowable points for any element is 60, and the minimum is 5.
- Please sign and date the performance plan at the bottom of page 1.
- Ask Theo to sign page 1 as the pay pool manager.
- Mail the original performance plan to me. I will sign it and then scan the final plan back to you.

Sounds more complicated than it really is.

Thanks

Jim


--
Jim Waters
Social Science Research Group
NOAA National Marine Fisheries Service
Beaufort Laboratory
101 Pivers Island Road
Beaufort NC 28516
Telephone: 252-728-8710
E-mail: Jim.Waters@noaa.gov

---

**2 attachments**

📄 **MarvastiWorkPlan2011.pdf**
170K

📄 **Marvasti FY11 supplemental guidance for work plan.doc**
37K



Marvasti FY11
supple...lan.doc

**Akbar Marvasti: Supplemental explanation and guidance about expectations for work assigned in the F11 performance plan**

*Performance Element: Economic Research*

1. Compare Gulf landings and dockside revenues in 2010 with historical average landings and dockside revenues as a preliminary measure of the effects of the Deepwater Horizon oil discharge on commercial fisheries in the Gulf of Mexico. Historical averages are interpreted as expected values for 2010. The differences between actual and expected values are interpreted as the effects of the oil spill. Admittedly, this is a rough approximation of the supply-side effects of the oil spill on commercial fisheries because random deviations from the average during any particular year could cause the comparison of actual and expected fishery performance to either overestimate or underestimate the actual effects of the oil spill.

   At any rate, your assignment is to make comparisons by month for shrimp, oysters, blue crab, menhaden, all other finfish combined, and all other shellfish combined. It may worthwhile to make additional comparisons for some highly managed species such as red snapper and groupers. Final data for 2010 should be available with 4-6 month lags. Thus, final data for Jan-April, 2010, should be available by now. Keep in touch with Steve Turner or Dave Gloeckner about progress in finalizing commercial ALS data for 2010. Final data for Jan-Dec, 2010, should be available by May 2011. Target deadlines: Prepare a preliminary description of historical averages by Nov 30, 2010. Finish the comparison of historical averages with monthly results for 2010 by May 31, 2011.

2. Estimate a demand curve for Gulf shrimp. There is a lot of talk about a downward shift in demand for Gulf seafood as a result of the DWH accident. We should be able to use historical data to estimate a demand curve and test whether prices are low because of a shift in demand or because of other confounding factors such as increasing supplies of imports or lower incomes (and lower restaurant expenditures) due to the faltering economy. There have been several previous studies about shrimp demand that you can build upon. Most of our data pertains to the ex-vessel (i.e., dockside level), but you may be able to obtain indices of wholesale prices for use in a simultaneous equations model. Target deadline: preliminary econometric results by Aug 31, 2011.

3. Collaborate with Tony Lamberte to estimate red snapper prices pre-IFQ and post-IFQ in the Gulf of Mexico. Tony has a good start on this project already and needs assistance in preparing a journal quality manuscript. Timing of work on this project should be determined in consultation with Tony and in consideration of his schedule.

4. You will be our primary contact with Alan Haynie about the FishSet project. At this time, the level of our involvement in the FishSet project is ambiguous. Alan wants to develop a tool that can be adapted to particular fishery problems, but it

still is not clear if Alan and his assistants plan to perform the adaptations and analyses for us. Because we are unclear about the model and its utility, I am hesitant to commit a large amount of time to the project this year. I would be willing to commit more time next year if FishSet can be demonstrated to be useful for the types of fishery management problems we have in the southeast.

Alan plans to visit the Miami lab during the week of Jan 10, 2011, at which time we will learn more about his expectations. The best scenario for us is that we help Alan identify a problem that will be relevant to FishSet and the southeast, and then provide the data to him to perform the analysis.

One potential application is to apply the FishSet model to estimate changes in commercial fishing activity in the Gulf of Mexico during the DWH oil discharge. Assignment #2 examines potential demand-side effects of the oil spill on the shrimp fishery. Assignment #1 offers a rough and quick approximation of the supply-side effects of the oil discharge on commercial fishing activities in general. FishSet could offer an opportunity for a more detailed and in-depth study of supply-side effects of the oil spill on commercial fisheries by examining the ways in which fishing behavior and productivity may have changed due to the presence of oil.

For this assignment:
  a. Plan to meet with Alan to determine if FishSet is applicable to the oil spill. At issue is the fact that changes in fishing behavior were dictated by the one-time (but prolonged) spill event and the resulting area closures rather than the result of an economic choice among fishing sites due to differences in catch rates, harvesting costs or profitability.
  b. Be prepared to provide him with details about the variables that are available in our databases and their overall file structure. Obtain a copy of the data collection form for the coastal fisheries logbook system. And find out how the reef fish VMS database is organized.
  c. Also, get a copy of the data collection form for the Florida trip ticket system. The Florida trip-ticket data is more comprehensive than logbook data because they include trips by vessels without federal licenses. However, the trip ticket data does not collect as much information about fishing effort. Both logbook and trip ticket data are available at the Science Center and could be merged with VMS data for reef fish trips from the regional office.
  d. Plan to provide these data, or a subset of the data, to Alan for his use with FishSet. In the meeting with Alan in January, try not to agree to perform major data manipulations for him because it could turn out to involve a substantial commitment of time. See my earlier comment about being hesitant to commit large amounts of time to the project until its utility is established.

5. Assist Christopher with the data collection for offshore shrimp fishery, if requested. This would not be glamorous, but you would become familiar with this data collection and the data that result from it. Hopefully, the experience would enhance your knowledge of the shrimp fishery, and perhaps lead to some joint reports by Liese and Marvasti.

6. Heads-up for FY12: There is some talk that we may get up to $1 million per year from FY12-FY16 for the purpose of studying consumer attitudes and perceptions regarding the safety of Gulf seafood. Some of the money could be for a marketing campaign to overcome negative attitudes and perceptions among potential (wholesale and retail) purchasers of Gulf seafood. The marketing function is not within our research mission, and money for this project should be made available to Sea Grant or some other similar organization.

If the money becomes available, the logical first step for a high-profile project like this is to organize and conduct a workshop with attendees from other research institutions and state marine fisheries agencies in the Gulf region to develop a research and spending plan. The workshop should be held as early as possible in FY12 so that projects can be identified and contracts awarded during FY12. The NMFS usually requires that all statements of work and other administrative paperwork for prospective contracts must be submitted to the contracts office by dates that vary with the expected amount of each contract. The due dates for large contracts in excess of $100,000 usually occur in April. Smaller contracts between $10,000 and $100,000 are usually due in May or June. These deadlines are required to award contracts by the end of the fiscal year in September, and imply that the workshop should be held no later than March (perhaps in conjunction with the annual meeting of the Gulf States Marine Fisheries Commission).

Based on your current activity regarding the oil spill, you would be a logical choice to plan this workshop and coordinate the resulting research projects, but the final decision to assign this project to you must be made by the new supervisor of the SSRG, and also will depend on the availability of the money.

### *Performance Element: Support for Management*
1. Review economic sections of amendments to fishery management plans, as assigned. As background, the regional office prepares amendments to fishery management plans. These amendments must contain descriptions of the recreational and commercial fisheries, as well as an evaluation of the economic effects of proposed management actions on the fisheries. Usually, David will review the sections of amendments that deal with recreational fisheries. However, sometimes the regional office will request that David conduct an analysis of proposed management. In these cases, David cannot review his own work. This is when you will be asked to review the recreational portions of amendments. The best time to review amendments is when they are presented in draft format to one of the fishery management councils. Eventually, the Science

Center must certify that the amendments are based on best available science. We want to find problems during the draft stages of the amendment so that the final certification can be made without delaying the amendment. Target deadlines: drafts of amendments usually become available prior to council meetings.

***Performance Element: Professional Development***
Complete projects that were started prior to joining the NOAA.

Your academic experience and publication record would have qualified you for a ZP-4 position with NMFS. However, the position was advertised at the ZP-3 level only. Therefore, you will have to discuss the possibility of a promotion with the new supervisor. Assignment #2 (estimate a demand curve for shrimp) is an excellent project to demonstrate your competence and justify a nomination for a promotion.